(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KIMBLE ET AL. *v.* MARVEL ENTERTAINMENT, LLC, SUCCESSOR TO MARVEL ENTERPRISES, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 13–720. Argued March 31, 2015—Decided June 22, 2015

Respondent Marvel Entertainment's corporate predecessor agreed to purchase petitioner Stephen Kimble's patent for a Spider-Man toy in exchange for a lump sum plus a 3% royalty on future sales. The agreement set no end date for royalties. As the patent neared the end of its statutory 20-year term, Marvel discovered *Brulotte* v. *Thys Co.*, 379 U. S. 29, in which this Court held that a patentee cannot continue to receive royalties for sales made after his patent expires. Marvel then sought a declaratory judgment in federal district court confirming that it could stop paying Kimble royalties. The district court granted relief, and the Ninth Circuit affirmed. Kimble now asks this Court to overrule *Brulotte*.

*Held*: *Stare decisis* requires this Court to adhere to *Brulotte*. Pp. 3–18.

(a) A patent typically expires 20 years from its application date. 35 U. S. C. §154(a)(2). At that point, the unrestricted right to make or use the article passes to the public. See *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225, 230. This Court has carefully guarded the significance of that expiration date, declining to enforce laws and contracts that restrict free public access to formerly patented, as well as unpatentable, inventions. See, *e.g., id.,* at 230–233; *Scott Paper Co.* v. *Marcalus Mfg. Co.*, 326 U. S. 249, 255–256.

*Brulotte* applied that principle to a patent licensing agreement that provided for the payment of royalties accruing after the patent's expiration. 379 U. S., at 30. The Court held that the post-patent royalty provision was "unlawful *per se*," *id.,* at 30, 32, because it continued "the patent monopoly beyond the [patent] period," *id.,* at 33, and, in so doing, conflicted with patent law's policy of establishing a "post-expiration . . . public domain," *ibid.*

Syllabus

The *Brulotte* rule may prevent some parties from entering into deals they desire, but parties can often find ways to achieve similar outcomes. For example, *Brulotte* leaves parties free to defer payments for pre-expiration use of a patent, tie royalties to non-patent rights, or make non-royalty-based business arrangements. Contending that such alternatives are not enough, Kimble asks this Court to abandon *Brulotte*'s bright-line rule in favor of a case-by-case approach based on antitrust law's "rule of reason." Pp. 3–7.

(b) The doctrine of *stare decisis* provides that today's Court should stand by yesterday's decisions. Application of that doctrine, though "not an inexorable command," is the "preferred course." *Payne* v. *Tennessee*, 501 U. S. 808, 828, 827. Overruling a case always requires "special justification"—over and above the belief "that the precedent was wrongly decided." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U. S. ___, ___. Where, as here, the precedent interprets a statute, *stare decisis* carries enhanced force, since critics are free to take their objections to Congress. See *e.g., Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173. Congress, moreover, has spurned multiple opportunities to reverse *Brulotte*, see *Watson* v. *United States*, 552 U. S. 74, 82–83, and has even rebuffed bills that would have replaced *Brulotte*'s *per se* rule with the standard Kimble urges. In addition, *Brulotte* implicates property and contract law, two contexts in which considerations favoring *stare decisis* are "at their acme," *Payne,* 501 U. S., at 828, because parties are especially likely to rely on such precedents when ordering their affairs.

Given those good reasons for adhering to *stare decisis* in this case, this Court would need a very strong justification for overruling *Brulotte.* But traditional justifications for abandoning *stare decisis* do not help Kimble here. First, *Brulotte*'s doctrinal underpinnings have not eroded over time. The patent statute at issue in *Brulotte* is essentially unchanged. And the precedent on which the *Brulotte* Court primarily relied, like other decisions enforcing a patent's cut-off date, remains good law. Indeed, *Brulotte*'s close relation to a whole web of precedents means that overruling it could threaten others. Second, nothing about *Brulotte* has proved unworkable. See *Patterson*, 491 U. S., at 173. To the contrary, the decision itself is simple to apply—particularly as compared to Kimble's proposed alternative, which can produce high litigation costs and unpredictable results. Pp. 7–12.

(c) Neither of the justifications Kimble offers gives cause to overrule *Brulotte.* Pp. 12–18.

(1) Kimble first argues the *Brulotte* hinged on an economic error—*i.e.,* an assumption that post-expiration royalties are always anticompetitive. This Court sees no error in Kimble's economic analy-

Syllabus

sis. But even assuming Kimble is right that *Brulotte* relied on an economic misjudgment, Congress is the right entity to fix it. The patent laws are not like the Sherman Act, which gives courts exceptional authority to shape the law and reconsider precedent based on better economic analysis. Moreover, Kimble's argument is based not on evolving economic theory but rather on a claim that the *Brulotte* Court simply made the wrong call. That claim fails to clear *stare decisis*'s high bar. In any event, *Brulotte* did not even turn on the notion that post-patent royalties harm competition. Instead, the *Brulotte* Court simply applied the categorical principle that all patent-related benefits must end when the patent term expires. Kimble's real complaint may go to the merits of that principle as a policy matter. But Congress, not this Court, gets to make patent policy. Pp. 12–16.

(2) Kimble also argues that *Brulotte* suppresses technological innovation and harms the national economy by preventing parties from reaching agreements to commercialize patents. This Court cannot tell whether that is true. *Brulotte* leaves parties free to enter alternative arrangements that may suffice to accomplish parties' payment deferral and risk-spreading goals. And neither Kimble nor his *amici* offer any empirical evidence connecting *Brulotte* to decreased innovation. In any event, claims about a statutory precedent's consequences for innovation are "more appropriately addressed to Congress." *Halliburton*, 573 U. S., at \_\_\_. Pp. 16–18.

727 F. 3d 856, affirmed.

KAGAN, J., delivered the opinion of the Court, in which SCALIA, KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

-------------

No. 13–720

-------------

## STEPHEN KIMBLE, ET AL., PETITIONERS *v.* MARVEL ENTERTAINMENT, LLC, SUCCESSOR TO MARVEL ENTERPRISES, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE KAGAN delivered the opinion of the Court.

In *Brulotte* v. *Thys Co.*, 379 U. S. 29 (1964), this Court held that a patent holder cannot charge royalties for the use of his invention after its patent term has expired. The sole question presented here is whether we should overrule *Brulotte*. Adhering to principles of *stare decisis*, we decline to do so. Critics of the *Brulotte* rule must seek relief not from this Court but from Congress.

I

In 1990, petitioner Stephen Kimble obtained a patent on a toy that allows children (and young-at-heart adults) to role-play as "a spider person" by shooting webs—really, pressurized foam string—"from the palm of [the] hand." U. S. Patent No. 5,072,856, Abstract (filed May 25, 1990).[1] Respondent Marvel Entertainment, LLC (Marvel) makes and markets products featuring Spider-Man, among other comic-book characters. Seeking to sell or license his pa-

-------------

[1] Petitioner Robert Grabb later acquired an interest in the patent. For simplicity, we refer only to Kimble.

tent, Kimble met with the president of Marvel's corporate predecessor to discuss his idea for web-slinging fun. Soon afterward, but without remunerating Kimble, that company began marketing the "Web Blaster"—a toy that, like Kimble's patented invention, enables would-be action heroes to mimic Spider-Man through the use of a polyester glove and a canister of foam.

Kimble sued Marvel in 1997 alleging, among other things, patent infringement. The parties ultimately settled that litigation. Their agreement provided that Marvel would purchase Kimble's patent in exchange for a lump sum (of about a half-million dollars) and a 3% royalty on Marvel's future sales of the Web Blaster and similar products. The parties set no end date for royalties, apparently contemplating that they would continue for as long as kids want to imitate Spider-Man (by doing whatever a spider can).

And then Marvel stumbled across *Brulotte*, the case at the heart of this dispute. In negotiating the settlement, neither side was aware of *Brulotte*. But Marvel must have been pleased to learn of it. *Brulotte* had read the patent laws to prevent a patentee from receiving royalties for sales made after his patent's expiration. See 379 U. S., at 32. So the decision's effect was to sunset the settlement's royalty clause.[2] On making that discovery, Marvel sought a declaratory judgment in federal district court confirming that the company could cease paying royalties come 2010—the end of Kimble's patent term. The court approved that relief, holding that *Brulotte* made "the royalty provision . . . unenforceable after the expiration of the Kimble patent." 692 F. Supp. 2d 1156, 1161 (Ariz. 2010).

_____

[2] In *Brulotte,* the patent holder retained ownership of the patent while licensing customers to use the patented article in exchange for royalty payments. See 379 U. S., at 29–30. By contrast, Kimble sold his whole patent to obtain royalties. But no one here disputes that *Brulotte* covers a transaction structured in that alternative way.

The Court of Appeals for the Ninth Circuit affirmed, though making clear that it was none too happy about doing so. "[T]he *Brulotte* rule," the court complained, "is counterintuitive and its rationale is arguably unconvincing." 727 F. 3d 856, 857 (2013).

We granted certiorari, 574 U. S. ___ (2014), to decide whether, as some courts and commentators have suggested, we should overrule *Brulotte*.[3] For reasons of *stare decisis*, we demur.

## II

Patents endow their holders with certain superpowers, but only for a limited time. In crafting the patent laws, Congress struck a balance between fostering innovation and ensuring public access to discoveries. While a patent lasts, the patentee possesses exclusive rights to the patented article—rights he may sell or license for royalty payments if he so chooses. See 35 U. S. C. §154(a)(1). But a patent typically expires 20 years from the day the application for it was filed. See §154(a)(2). And when the patent expires, the patentee's prerogatives expire too, and the right to make or use the article, free from all restriction, passes to the public. See *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225, 230 (1964).

This Court has carefully guarded that cut-off date, just as it has the patent laws' subject-matter limits: In case after case, the Court has construed those laws to preclude

---

[3] See, *e.g., Scheiber* v. *Dolby Labs., Inc.*, 293 F. 3d 1014, 1017–1018 (CA7 2002) (Posner, J.) (*Brulotte* has been "severely, and as it seems to us, with all due respect, justly criticized . . . . However, we have no authority to overrule a Supreme Court decision no matter how dubious its reasoning strikes us, or even how out of touch with the Supreme Court's current thinking the decision seems"); Ayres & Klemperer, Limiting Patentees' Market Power Without Reducing Innovation Incentives: The Perverse Benefits of Uncertainty and Non-Injunctive Remedies, 97 Mich. L. Rev. 985, 1027 (1999) ("Our analysis . . . suggests that *Brulotte* should be overruled").

measures that restrict free access to formerly patented, as well as unpatentable, inventions. In one line of cases, we have struck down state statutes with that consequence. See, *e.g., id.,* at 230–233; *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141, 152, 167–168 (1989); *Compco Corp.* v. *Day-Brite Lighting, Inc.*, 376 U. S. 234, 237–238 (1964). By virtue of federal law, we reasoned, "an article on which the patent has expired," like an unpatentable article, "is in the public domain and may be made and sold by whoever chooses to do so." *Sears*, 376 U. S., at 231. In a related line of decisions, we have deemed unenforceable private contract provisions limiting free use of such inventions. In *Scott Paper Co.* v. *Marcalus Mfg. Co.*, 326 U. S. 249 (1945), for example, we determined that a manufacturer could not agree to refrain from challenging a patent's validity. Allowing even a single company to restrict its use of an expired or invalid patent, we explained, "would deprive . . . the consuming public of the advantage to be derived" from free exploitation of the discovery. *Id.,* at 256. And to permit such a result, whether or not authorized "by express contract," would impermissibly undermine the patent laws. *Id.,* at 255–256; see also, *e.g., Edward Katzinger Co.* v. *Chicago Metallic Mfg. Co.*, 329 U. S. 394, 400–401 (1947) (ruling that *Scott Paper* applies to licensees); *Lear, Inc.* v. *Adkins*, 395 U. S. 653, 668–675 (1969) (refusing to enforce a contract requiring a licensee to pay royalties while contesting a patent's validity).

*Brulotte* was brewed in the same barrel. There, an inventor licensed his patented hop-picking machine to farmers in exchange for royalties from hop crops harvested both before and after his patents' expiration dates. The Court (by an 8-1 vote) held the agreement unenforceable— "unlawful *per se*"—to the extent it provided for the payment of royalties "accru[ing] after the last of the patents incorporated into the machines had expired." 379 U. S., at

30, 32. To arrive at that conclusion, the Court began with the statutory provision setting the length of a patent term. See *id.*, at 30 (quoting the then-current version of §154). Emphasizing that a patented invention "become[s] public property once [that term] expires," the Court then quoted from *Scott Paper*: Any attempt to limit a licensee's post-expiration use of the invention, "whatever the legal device employed, runs counter to the policy and purpose of the patent laws." 379 U. S., at 31 (quoting 326 U. S., at 256). In the *Brulotte* Court's view, contracts to pay royalties for such use continue "the patent monopoly beyond the [patent] period," even though only as to the licensee affected. 379 U. S., at 33. And in so doing, those agreements conflict with patent law's policy of establishing a "post-expiration . . . public domain" in which every person can make free use of a formerly patented product. *Ibid.*

The *Brulotte* rule, like others making contract provisions unenforceable, prevents some parties from entering into deals they desire. As compared to lump-sum fees, royalty plans both draw out payments over time and tie those payments, in each month or year covered, to a product's commercial success. And sometimes, for some parties, the longer the arrangement lasts, the better—not just up to but beyond a patent term's end. A more extended payment period, coupled (as it presumably would be) with a lower rate, may bring the price the patent holder seeks within the range of a cash-strapped licensee. (Anyone who has bought a product on installment can relate.) See Brief for Memorial Sloan Kettering Cancer Center et al. as *Amici Curiae* 17. Or such an extended term may better allocate the risks and rewards associated with commercializing inventions—most notably, when years of development work stand between licensing a patent and bringing a product to market. See, *e.g.,* 3 R. Milgrim & E. Bensen, Milgrim on Licensing §18.05, p. 18–9 (2013). As to either goal, *Brulotte* may pose an obstacle.

Yet parties can often find ways around *Brulotte*, enabling them to achieve those same ends. To start, *Brulotte* allows a licensee to defer payments for pre-expiration use of a patent into the post-expiration period; all the decision bars are royalties for using an invention after it has moved into the public domain. See 379 U. S., at 31; *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 136 (1969). A licensee could agree, for example, to pay the licensor a sum equal to 10% of sales during the 20-year patent term, but to amortize that amount over 40 years. That arrangement would at least bring down early outlays, even if it would not do everything the parties might want to allocate risk over a long timeframe. And parties have still more options when a licensing agreement covers either multiple patents or additional non-patent rights. Under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires. See 379 U. S., at 30. Too, post-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent. See, *e.g.,* 3 Milgrim on Licensing §18.07, at 18–16 to 18–17. That means, for example, that a license involving both a patent and a trade secret can set a 5% royalty during the patent period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone). Finally and most broadly, *Brulotte* poses no bar to business arrangements other than royalties—all kinds of joint ventures, for example—that enable parties to share the risks and rewards of commercializing an invention.

Contending that such alternatives are not enough, Kimble asks us to abandon *Brulotte* in favor of "flexible, case-by-case analysis" of post-expiration royalty clauses "under the rule of reason." Brief for Petitioners 45. Used in antitrust law, the rule of reason requires courts to evaluate a practice's effect on competition by "taking into account a variety of factors, including specific information

about the relevant business, its condition before and after the [practice] was imposed, and the [practice's] history, nature, and effect." *State Oil Co.* v. *Khan*, 522 U. S. 3, 10 (1997). Of primary importance in this context, Kimble posits, is whether a patent holder has power in the relevant market and so might be able to curtail competition. See Brief for Petitioners 47–48; *Illinois Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U. S. 28, 44 (2006) ("[A] patent does not necessarily confer market power"). Resolving that issue, Kimble notes, entails "a full-fledged economic inquiry into the definition of the market, barriers to entry, and the like." Brief for Petitioners 48 (quoting 1 H. Hovenkamp, M. Janis, M. Lemley, & C. Leslie, IP and Antitrust §3.2e, p. 3–12.1 (2d ed., Supp. 2014) (Hovenkamp)).

## III

Overruling precedent is never a small matter. *Stare decisis*—in English, the idea that today's Court should stand by yesterday's decisions—is "a foundation stone of the rule of law." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. ___, ___ (2014) (slip op., at 15). Application of that doctrine, although "not an inexorable command," is the "preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827–828 (1991). It also reduces incentives for challenging settled precedents, saving parties and courts the expense of endless relitigation.

Respecting *stare decisis* means sticking to some wrong decisions. The doctrine rests on the idea, as Justice Brandeis famously wrote, that it is usually "more important that the applicable rule of law be settled than that it be settled right." *Burnet* v. *Coronado Oil & Gas Co.*, 285

U. S. 393, 406 (1932) (dissenting opinion). Indeed, *stare decisis* has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up. Accordingly, an argument that we got something wrong—even a good argument to that effect—cannot by itself justify scrapping settled precedent. Or otherwise said, it is not alone sufficient that we would decide a case differently now than we did then. To reverse course, we require as well what we have termed a "special justification"—over and above the belief "that the precedent was wrongly decided." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U. S. ___, ___ (2014) (slip op., at 4).

What is more, *stare decisis* carries enhanced force when a decision, like *Brulotte*, interprets a statute. Then, unlike in a constitutional case, critics of our ruling can take their objections across the street, and Congress can correct any mistake it sees. See, *e.g., Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989). That is true, contrary to the dissent's view, see *post,* at 6–7 (opinion of ALITO, J.), regardless whether our decision focused only on statutory text or also relied, as *Brulotte* did, on the policies and purposes animating the law. See, *e.g., Bilski* v. *Kappos*, 561 U. S. 593, 601–602 (2010). Indeed, we apply statutory *stare decisis* even when a decision has announced a "judicially created doctrine" designed to implement a federal statute. *Halliburton*, 573 U. S., at ___ (slip op., at 12). All our interpretive decisions, in whatever way reasoned, effectively become part of the statutory scheme, subject (just like the rest) to congressional change. Absent special justification, they are balls tossed into Congress's court, for acceptance or not as that branch elects.

And Congress has spurned multiple opportunities to reverse *Brulotte*—openings as frequent and clear as this Court ever sees. *Brulotte* has governed licensing agreements for more than half a century. See *Watson* v. *United*

*States*, 552 U. S. 74, 82–83 (2007) (stating that "long congressional acquiescence," there totaling just 14 years, "enhance[s] even the usual precedential force we accord to our interpretations of statutes" (internal quotation marks omitted)). During that time, Congress has repeatedly amended the patent laws, including the specific provision (35 U. S. C. §154) on which *Brulotte* rested. See, *e.g.*, Uruguay Round Agreements Act, §532(a), 108 Stat. 4983 (1994) (increasing the length of the patent term); Act of Nov. 19, 1988, §201, 102 Stat. 4676 (limiting patent-misuse claims). *Brulotte* survived every such change. Indeed, Congress has rebuffed bills that would have re-placed *Brulotte*'s *per se* rule with the same antitrust-style analysis Kimble now urges. See, *e.g.,* S. 1200, 100th Cong., 1st Sess., Tit. II (1987) (providing that no patent owner would be guilty of "illegal extension of the patent right by reason of his or her licensing practices . . . unless such practices . . . violate the antitrust laws"); S. 438, 100th Cong., 2d Sess., §201(3) (1988) (same). Congress's continual reworking of the patent laws—but never of the *Brulotte* rule—further supports leaving the decision in place.

Nor yet are we done, for the subject matter of *Brulotte* adds to the case for adhering to precedent. *Brulotte* lies at the intersection of two areas of law: property (patents) and contracts (licensing agreements). And we have often recognized that in just those contexts—"cases involving property and contract rights"—considerations favoring *stare decisis* are "at their acme." *E.g., Payne*, 501 U. S., at 828; *Khan*, 522 U. S., at 20. That is because parties are especially likely to rely on such precedents when ordering their affairs. To be sure, Marvel and Kimble disagree about whether *Brulotte* has actually generated reliance. Marvel says yes: Some parties, it claims, do not specify an end date for royalties in their licensing agreements, in-stead relying on *Brulotte* as a default rule. Brief for Re-

spondent 32–33; see 1 D. Epstein, Eckstrom's Licensing in Foreign and Domestic Operations §3.13, p. 3–13, and n. 2 (2014) (noting that it is not "necessary to specify the term . . . of the license" when a decision like *Brulotte* limits it "by law"). Overturning *Brulotte* would thus upset expectations, most so when long-dormant licenses for long-expired patents spring back to life. Not true, says Kimble: Unfair surprise is unlikely, because no "meaningful number of [such] license agreements . . . actually exist." Reply Brief 18. To be honest, we do not know (nor, we suspect, do Marvel and Kimble). But even uncertainty on this score cuts in Marvel's direction. So long as we see a reasonable possibility that parties have structured their business transactions in light of *Brulotte*, we have one more reason to let it stand.

As against this superpowered form of *stare decisis*, we would need a superspecial justification to warrant reversing *Brulotte*. But the kinds of reasons we have most often held sufficient in the past do not help Kimble here. If anything, they reinforce our unwillingness to do what he asks.

First, *Brulotte*'s statutory and doctrinal underpinnings have not eroded over time. When we reverse our statutory interpretations, we most often point to subsequent legal developments—"either the growth of judicial doctrine or further action taken by Congress"—that have removed the basis for a decision. *Patterson*, 491 U. S., at 173 (calling this "the primary reason" for overruling statutory precedent). But the core feature of the patent laws on which *Brulotte* relied remains just the same: Section 154 now, as then, draws a sharp line cutting off patent rights after a set number of years. And this Court has continued to draw from that legislative choice a broad policy favoring unrestricted use of an invention after its patent's expiration. See *supra,* at 3–4. *Scott Paper*—the decision on which *Brulotte* primarily relied—remains good law. So too

do this Court's other decisions refusing to enforce either
state laws or private contracts constraining individuals'
free use of formerly patented (or unpatentable) discover-
ies. See *supra,* at 3–4. *Brulotte*, then, is not the kind of
doctrinal dinosaur or legal last-man-standing for which
we sometimes depart from *stare decisis*. Compare, *e.g.,*
*Alleyne* v. *United States*, 570 U. S. \_\_\_, \_\_\_–\_\_\_ (2013)
(SOTOMAYOR, J., concurring) (slip op., at 2–5). To the
contrary, the decision's close relation to a whole web of
precedents means that reversing it could threaten others.
If *Brulotte* is outdated, then (for example) is *Scott Paper*
too? We would prefer not to unsettle stable law.[4]

  And second, nothing about *Brulotte* has proved unwork-
able. See, *e.g., Patterson*, 491 U. S., at 173 (identifying
unworkability as another "traditional justification" for

_____

  [4] The only legal erosion to which Kimble gestures is a change in the
treatment of patent tying agreements—*i.e.,* contracts conditioning a
licensee's right to use a patent on the purchase of an unpatented
product. See Brief for Petitioners 43. When *Brulotte* was decided,
those agreements counted as *per se* antitrust violations and patent
misuse; now, they are unlawful only if the patent holder wields power
in the relevant market. See Act of Nov. 19, 1988, §201, 102 Stat. 4676
(adding the market power requirement in the patent misuse context);
*Illinois Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U. S. 28, 41–43
(2006) (relying on that legislative change to overrule antitrust decisions
about tying and to adopt the same standard). But it is far from clear
that the old rule of tying was among *Brulotte*'s legal underpinnings.
*Brulotte* briefly analogized post-expiration royalty agreements to tying
arrangements, but only after relating the statutory and caselaw basis
for its holding and "conclud[ing]" that post-patent royalties are "unlaw-
ful *per se*." 379 U. S., at 32. And even if that analogy played some real
role in *Brulotte*, the development of tying law would not undercut the
decision—rather the opposite. Congress took the lead in changing the
treatment of tying agreements and, in doing so, conspicuously left
*Brulotte* in place. Indeed, Congress declined to enact bills that would
have modified not only tying doctrine but also *Brulotte*. See *supra,* at 9
(citing S. 1200, 100th Cong., 1st Sess. (1987), and S. 438, 100th Cong.,
2d Sess. (1988)). That choice suggests congressional acquiescence in
*Brulotte*, and so further supports adhering to *stare decisis*.

overruling precedent). The decision is simplicity itself to apply. A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice. *Brulotte*'s ease of use appears in still sharper relief when compared to Kimble's proposed alternative. Recall that he wants courts to employ antitrust law's rule of reason to identify and invalidate those post-expiration royalty clauses with anticompetitive consequences. See *supra,* at 6–7. But whatever its merits may be for deciding antitrust claims, that "elaborate inquiry" produces notoriously high litigation costs and unpredictable results. *Arizona* v. *Maricopa County Medical Soc.*, 457 U. S. 332, 343 (1982). For that reason, trading in *Brulotte* for the rule of reason would make the law less, not more, workable than it is now. Once again, then, the case for sticking with long-settled precedent grows stronger: Even the most usual reasons for abandoning *stare decisis* cut the other way here.

## IV

Lacking recourse to those traditional justifications for overruling a prior decision, Kimble offers two different ones. He claims first that *Brulotte* rests on a mistaken view of the competitive effects of post-expiration royalties. He contends next that *Brulotte* suppresses technological innovation and so harms the nation's economy. (The dissent offers versions of those same arguments. See *post,* at 1–4.) We consider the two claims in turn, but our answers to both are much the same: Kimble's reasoning may give Congress cause to upset *Brulotte*, but does not warrant this Court's doing so.

## A

According to Kimble, we should overrule *Brulotte* because it hinged on an error about economics: It assumed that post-patent royalty "arrangements are invariably

anticompetitive." Brief for Petitioners 37. That is not true, Kimble notes; indeed, such agreements more often increase than inhibit competition, both before and after the patent expires. See *id.,* at 36–40. As noted earlier, a longer payment period will typically go hand-in-hand with a lower royalty rate. See *supra,* at 5. During the patent term, those reduced rates may lead to lower consumer prices, making the patented technology more competitive with alternatives; too, the lesser rates may enable more companies to afford a license, fostering competition among the patent's own users. See Brief for Petitioners 38. And after the patent's expiration, Kimble continues, further benefits follow: Absent high barriers to entry (a material caveat, as even he would agree, see Tr. of Oral Arg. 12–13, 23), the licensee's continuing obligation to pay royalties encourages new companies to begin making the product, figuring that they can quickly attract customers by under-cutting the licensee on price. See Brief for Petitioners 38–39. In light of those realities, Kimble concludes, "the *Brulotte per se* rule makes little sense." *Id.,* at 11.

We do not join issue with Kimble's economics—only with what follows from it. A broad scholarly consensus supports Kimble's view of the competitive effects of post-expiration royalties, and we see no error in that shared analysis. See *id.,* at 13–18 (citing numerous treatises and articles critiquing *Brulotte*). Still, we must decide what that means for *Brulotte*. Kimble, of course, says it means the decision must go. Positing that *Brulotte* turned on the belief that post-expiration royalties are always anticom-petitive, he invokes decisions in which this Court aban-doned antitrust precedents premised on similarly shaky economic reasoning. See Brief for Petitioners 55–56 (cit-ing, *e.g.*, *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877 (2007); *Illinois Tool Works*, 547 U. S. 28). But to agree with Kimble's conclusion, we must re-solve two questions in his favor. First, even assuming

Kimble accurately characterizes *Brulotte*'s basis, does the decision's economic mistake suffice to overcome *stare decisis*?  Second and more fundamentally, was *Brulotte* actually founded, as Kimble contends, on an analysis of competitive effects?

If *Brulotte* were an antitrust rather than a patent case, we might answer both questions as Kimble would like.  This Court has viewed *stare decisis* as having less-than-usual force in cases involving the Sherman Act.  See, *e.g., Khan*, 522 U. S., at 20–21.  Congress, we have explained, intended that law's reference to "restraint of trade" to have "changing content," and authorized courts to oversee the term's "dynamic potential."  *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 731–732 (1988).  We have therefore felt relatively free to revise our legal analysis as economic understanding evolves and (just as Kimble notes) to reverse antitrust precedents that misperceived a practice's competitive consequences.  See *Leegin*, 551 U. S., at 899–900.  Moreover, because the question in those cases was whether the challenged activity restrained trade, the Court's rulings necessarily turned on its understanding of economics.  See *Business Electronics Corp.*, 485 U. S., at 731.  Accordingly, to overturn the decisions in light of sounder economic reasoning was to take them "on [their] own terms."  *Halliburton,* 573 U. S., at ___ (slip op., at 9).

But *Brulotte* is a patent rather than an antitrust case, and our answers to both questions instead go against Kimble.  To begin, even assuming that *Brulotte* relied on an economic misjudgment, Congress is the right entity to fix it.  By contrast with the Sherman Act, the patent laws do not turn over exceptional law-shaping authority to the courts.  Accordingly, statutory *stare decisis*—in which this Court interprets and Congress decides whether to amend—retains its usual strong force.  See *supra,* at 8.  And as we have shown, that doctrine does not ordinarily

bend to "wrong on the merits"-type arguments; it instead assumes Congress will correct whatever mistakes we commit. See *supra,* at 7–8. Nor does Kimble offer any reason to think his own "the Court erred" claim is special. Indeed, he does not even point to anything that has changed since *Brulotte*—no new empirical studies or advances in economic theory. Compare, *e.g., Halliburton*, 573 U. S., at ___ (slip op., at 9–12) (considering, though finding insufficient, recent economic research). On his argument, the *Brulotte* Court knew all it needed to know to determine that post-patent royalties are not usually anticompetitive; it just made the wrong call. See Brief for Petitioners 36–40. That claim, even if itself dead-right, fails to clear *stare decisis*'s high bar.

And in any event, *Brulotte* did not hinge on the mistake Kimble identifies. Although some of its language invoked economic concepts, see n. 4, *supra*, the Court did not rely on the notion that post-patent royalties harm competition. Nor is that surprising. The patent laws—unlike the Sherman Act—do not aim to maximize competition (to a large extent, the opposite). And the patent term—unlike the "restraint of trade" standard—provides an all-encompassing bright-line rule, rather than calling for practice-specific analysis. So in deciding whether post-expiration royalties comport with patent law, *Brulotte* did not undertake to assess that practice's likely competitive effects. Instead, it applied a categorical principle that all patents, and all benefits from them, must end when their terms expire. See *Brulotte*, 379 U. S., at 30–32; *supra,* at 3–5. Or more specifically put, the Court held, as it had in *Scott Paper*, that Congress had made a judgment: that the day after a patent lapses, the formerly protected invention must be available to all for free. And further: that post-expiration restraints on even a single licensee's access to the invention clash with that principle. See *Brulotte*, 379 U. S., at 31–32 (a licensee's obligation to pay post-patent

royalties conflicts with the "free market visualized for the post-expiration period" and so "runs counter to the policy and purpose of the patent laws" (quoting *Scott Paper,* 326 U. S., at 256)). That patent (not antitrust) policy gave rise to the Court's conclusion that post-patent royalty contracts are unenforceable—utterly "regardless of a demonstrable effect on competition." 1 Hovenkamp §3.2d, at 3–10.

Kimble's real complaint may go to the merits of such a patent policy—what he terms its "formalis[m]," its "rigid[ity]", and its detachment from "economic reality." Brief for Petitioners 27–28. But that is just a different version of the argument that *Brulotte* is wrong. And it is, if anything, a version less capable than the last of trumping statutory *stare decisis.* For the choice of what patent policy should be lies first and foremost with Congress. So if Kimble thinks patent law's insistence on unrestricted access to formerly patented inventions leaves too little room for pro-competitive post-expiration royalties, then Congress, not this Court, is his proper audience.

### B

Kimble also seeks support from the wellspring of all patent policy: the goal of promoting innovation. *Brulotte*, he contends, "discourages technological innovation and does significant damage to the American economy." Brief for Petitioners 29. Recall that would-be licensors and licensees may benefit from post-patent royalty arrangements because they allow for a longer payment period and a more precise allocation of risk. See *supra,* at 5. If the parties' ideal licensing agreement is barred, Kimble reasons, they may reach no agreement at all. See Brief for Petitioners 32. And that possibility may discourage invention in the first instance. The bottom line, Kimble concludes, is that some "breakthrough technologies will never see the light of day." *Id.,* at 33.

Maybe. Or, then again, maybe not. While we recognize

that post-patent royalties are sometimes not anticompetitive, we just cannot say whether barring them imposes any meaningful drag on innovation. As we have explained, *Brulotte* leaves open various ways—involving both licensing and other business arrangements—to accomplish payment deferral and risk-spreading alike. See *supra,* at 6. Those alternatives may not offer the parties the precise set of benefits and obligations they would prefer. But they might still suffice to bring patent holders and product developers together and ensure that inventions get to the public. Neither Kimble nor his *amici* have offered any empirical evidence connecting *Brulotte* to decreased innovation; they essentially ask us to take their word for the problem. And the United States, which acts as both a licensor and a licensee of patented inventions while also implementing patent policy, vigorously disputes that *Brulotte* has caused any "significant real-world economic harm." Brief for United States as *Amicus Curiae* 30. Truth be told, if forced to decide that issue, we would not know where or how to start.

Which is one good reason why that is not our job. Claims that a statutory precedent has "serious and harmful consequences" for innovation are (to repeat this opinion's refrain) "more appropriately addressed to Congress." *Halliburton*, 573 U. S., at \_\_\_ (slip op., at 15). That branch, far more than this one, has the capacity to assess Kimble's charge that *Brulotte* suppresses technological progress. And if it concludes that *Brulotte* works such harm, Congress has the prerogative to determine the exact right response—choosing the policy fix, among many conceivable ones, that will optimally serve the public interest. As we have noted, Congress legislates actively with respect to patents, considering concerns of just the kind Kimble raises. See *supra,* at 9. In adhering to our precedent as against such complaints, we promote the rule-of-law values to which courts must attend while

leaving matters of public policy to Congress.

## V

What we can decide, we can undecide.  But *stare decisis* teaches that we should exercise that authority sparingly. Cf. S. Lee and S. Ditko, Amazing Fantasy No. 15: "Spider-Man," p. 13 (1962) ("[I]n this world, with great power there must also come—great responsibility").  Finding many reasons for staying the *stare decisis* course and no "special justification" for departing from it, we decline Kimble's invitation to overrule *Brulotte*.

For the reasons stated, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–720

_____

STEPHEN KIMBLE, ET AL., PETITIONERS *v.* MARVEL ENTERTAINMENT, LLC, SUCCESSOR TO MARVEL ENTERPRISES, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The Court employs *stare decisis*, normally a tool of restraint, to reaffirm a clear case of judicial overreach. Our decision in *Brulotte* v. *Thys Co.*, 379 U. S. 29 (1964), held that parties cannot enter into a patent licensing agreement that provides for royalty payments to continue after the term of the patent expires. That decision was not based on anything that can plausibly be regarded as an interpretation of the terms of the Patent Act. It was based instead on an economic theory—and one that has been debunked. The decision interferes with the ability of parties to negotiate licensing agreements that reflect the true value of a patent, and it disrupts contractual expectations. *Stare decisis* does not require us to retain this baseless and damaging precedent.

## I

### A

The Patent Act provides that a patent grants certain exclusive rights to the patentee and "his heirs or assigns" for a term of 20 years. 35 U. S. C. §§154(a)(1) and (2). The Act says nothing whatsoever about post-expiration royalties. In *Brulotte*, however, the Court held that such royal-

ties are *per se* unlawful.  The Court made little pretense of finding support for this holding in the language of the Act. Instead, the Court reasoned that allowing post-expiration royalties would subject "the free market visualized for the post-expiration period . . . to monopoly influences that have no proper place there."  379 U. S., at 32–33.  Invoking antitrust concepts, the decision suggested that such arrangements are "an effort to enlarge the monopoly of the patent by t[y]ing the sale or use of the patented article to the purchase or use of unpatented ones." *Id.,* at 33.

Whatever the merits of this economic argument, it does not represent a serious attempt to interpret the Patent Act.  A licensing agreement that provides for the payment of royalties after a patent's term expires does not enlarge the patentee's monopoly or extend the term of the patent. It simply gives the licensor a contractual right.  Thus, nothing in the text of the Act even arguably forbids licensing agreements that provide for post-expiration royalties.

*Brulotte* was thus a bald act of policymaking.  It was not simply a case of incorrect statutory interpretation.  It was not really statutory interpretation at all.

B

Not only was *Brulotte* based on policymaking, it was based on a policy that is difficult to defend.  Indeed, in the intervening 50 years, its reasoning has been soundly refuted.  See, *e.g.,* 10 P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶1782c.3, pp. 554–556 (3d ed. 2011); See & Caprio, The Trouble with *Brulotte*: The Patent Royalty Term and Patent Monopoly Extension, 1990 Utah L. Rev. 813, 846–851; *Scheiber* v. *Dolby Labs.*, *Inc.*, 293 F. 3d 1014, 1017 (CA7 2002); Brief for Petitioners 23–25, and n. 11 (collecting sources); *ante,* at 3, n. 3.

*Brulotte* misperceived the purpose and effect of post-expiration royalties.  The decision rested on the view that

post-expiration royalties extend the patent term by means of an anti-competitive tying arrangement. As the Court understood such an arrangement, the patent holder leverages its monopoly power during the patent term to require payments after the term ends, when the invention would otherwise be available for free public use. But agreements to pay licensing fees after a patent expires do not "enlarge the monopoly of the patent." 379 U. S., at 33. Instead, "[o]nce the patent term expires, the power to exclude is gone," and all that is left "is a problem about optimal contract design." Easterbrook, Contract and Copyright, 42 Hous. L. Rev. 953, 955 (2005).

The economics are simple: Extending a royalty term allows the parties to spread the licensing fees over a longer period of time, which naturally has the effect of reducing the fees during the patent term. See *ante,* at 5. Restricting royalty payments to the patent term, as *Brulotte* requires, compresses payment into a shorter period of higher fees. The Patent Act does not prefer one approach over the other.

There are, however, good reasons why parties sometimes prefer post-expiration royalties over upfront fees, and why such arrangements have pro-competitive effects. Patent holders and licensees are often unsure whether a patented idea will yield significant economic value, and it often takes years to monetize an innovation. In those circumstances, deferred royalty agreements are economically efficient. They encourage innovators, like universities, hospitals, and other institutions, to invest in research that might not yield marketable products until decades down the line. See Brief for Memorial Sloan Kettering Cancer Center et al. as *Amici Curiae* 8–12. And they allow producers to hedge their bets and develop more products by spreading licensing fees over longer periods. See *ibid.* By prohibiting these arrangements, *Brulotte* erects an obstacle to efficient patent use. In patent law

and other areas, we have abandoned *per se* rules with similarly disruptive effects. See, *e.g., Illinois Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U. S. 28 (2006); *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877 (2007).

The majority downplays this harm by insisting that "parties can often find ways around *Brulotte.*" *Ante,* at 6. But the need to avoid *Brulotte* is an economic inefficiency in itself. Parties are not always aware of the prohibition— as this case amply demonstrates. And the suggested alternatives do not provide the same benefits as post-expiration royalty agreements. For instance, although an agreement to amortize payments for sales during the patent term would "bring down early outlays," the Court admits that such an agreement might not reflect the parties' risk preferences. *Ante,* at 6. Moreover, such an arrangement would not necessarily yield the same amount of total royalties, particularly for an invention or a medical breakthrough that takes decades to develop into a marketable product. The sort of agreements that *Brulotte* prohibits would allow licensees to spread their costs, while *also* allowing patent holders to capitalize on slow-developing inventions.

C

On top of that, *Brulotte* most often functions to upset the parties' expectations.

This case illustrates the point. No one disputes that, when "negotiating the settlement, neither side was aware of *Brulotte.*" *Ante,* at 2. Without knowledge of our *per se* rule, the parties agreed that Marvel would pay 3% in royalties on all of its future sales involving the Web Blaster and similar products. If the parties had been aware of *Brulotte*, they might have agreed to higher payments during the patent term. Instead, both sides expected the royalty payments to continue until Marvel

stopped selling toys that fit the terms of the agreement. But that is not what happened. When Marvel discovered *Brulotte*, it used that decision to nullify a key part of the agreement. The parties' contractual expectations were shattered, and petitioners' rights were extinguished.

The Court's suggestion that some parties have come to rely on *Brulotte* is fanciful. The Court believes that there is a "reasonable possibility that parties have structured their business transactions in light of *Brulotte*." *Ante,* at 10. Its only support for this conclusion is Marvel's self-serving and unsupported assertion that some contracts might not specify an end date for royalties because the parties expect *Brulotte* to supply the default rule. To its credit, the Court stops short of endorsing this unlikely prediction, saying only that "uncertainty on this score cuts in Marvel's direction." *Ante,* at 10.

But there is no real uncertainty. "[W]e do not know" if Marvel's assertion is correct because Marvel has provided no evidence to support it. *Ibid.* And there are reasons to believe that, if parties actually relied on *Brulotte* to supply a default rule, courts would enforce the contracts as the parties expected. See, *e.g.,* 27 R. Lord, Williston on Contracts §70:124 (4th ed. 2003). What we know for sure, however, is that *Brulotte* has upended the parties' expectations here and in many other cases. See, *e.g., Scheiber*, 293 F. 3d, at 1016; *Boggild* v. *Kenner Products*, 853 F. 2d 465, 466–467 (CA6 1988); *Pitney Bowes, Inc.* v. *Mestre*, 701 F. 2d 1365, 1367, 1373 (CA11 1983). These confirmed problems with retaining *Brulotte* clearly outweigh Marvel's hypothetical fears.

## II

In the end, *Brulotte*'s only virtue is that we decided it. But that does not render it invincible. *Stare decisis* is important to the rule of law, but so are correct judicial decisions. Adherence to prior decisions "'promotes the

evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *Pearson* v. *Callahan*, 555 U. S. 223, 233 (2009) (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991)). But *stare decisis* is not an "inexorable command." *Payne*, *supra*, at 828; *Washington* v. *W. C. Dawson & Co.*, 264 U. S. 219, 238 (1924) (Brandeis, J., dissenting). "Revisiting precedent is particularly appropriate where, as here, a departure would not upset expectations, the precedent consists of a judge-made rule . . . , and experience has pointed up the precedent's shortcomings." *Pearson*, *supra,* at 233.

Our traditional approach to *stare decisis* does not require us to retain *Brulotte*'s *per se* rule. *Brulotte*'s holding had no basis in the law. Its reasoning has been thoroughly disproved. It poses economic barriers that stifle innovation. And it unsettles contractual expectations.

It is not decisive that Congress could have altered *Brulotte*'s rule. In general, we are especially reluctant to overturn decisions interpreting statutes because those decisions can be undone by Congress. See, *e.g., John R. Sand & Gravel Co.* v. *United States*, 552 U. S. 130, 139 (2008); *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989). The Court calls this a "superpowered form of *stare decisis*" that renders statutory interpretation decisions nearly impervious to challenge. *Ante,* at 10. I think this goes a bit too far.

As an initial matter, we do not give super-duper protection to decisions that do not actually interpret a statute. When a precedent is based on a judge-made rule and is not grounded in anything that Congress has enacted, we cannot "properly place on the shoulders of Congress" the entire burden of correcting "the Court's own error." *Girouard* v. *United States*, 328 U. S. 61, 69–70 (1946). On the contrary, we have recognized that it is appropriate for

us to correct rules of this sort. See, *e.g., Leegin,* 551 U. S., at 899–900; *State Oil Co.* v. *Khan,* 522 U. S. 3, 20–21 (1997).

The Court says that it might agree if *Brulotte* were an antitrust precedent because *stare decisis* has "less-than-usual force in cases involving the Sherman Act." *Ante,* at 14. But this distinction is unwarranted. We have been more willing to reexamine antitrust precedents because they have attributes of common-law decisions. I see no reason why the same approach should not apply where the precedent at issue, while purporting to apply a statute, is actually based on policy concerns. Indeed, we should be even more willing to reconsider such a precedent because the role implicitly assigned to the federal courts under the Sherman Act has no parallel in Patent Act cases.

Even taking the Court on its own terms, *Brulotte* was an antitrust decision masquerading as a patent case. The Court was principally concerned with patentees improperly leveraging their monopoly power. See 379 U. S., at 32–33. And it expressly characterized post-expiration royalties as anti-competitive tying arrangements. See *id.,* at 33. It makes no sense to afford greater *stare decisis* protection to *Brulotte*'s thinly veiled antitrust reasoning than to our Sherman Act decisions.

The Court also places too much weight on Congress' failure to overturn *Brulotte.* We have long cautioned that "[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Girouard, supra,* at 69. Even where Congress has considered, but not adopted, legislation that would abrogate a judicial ruling, it cannot be inferred that Congress' failure to act shows that it approves the ruling. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 187 (1994). "'[S]everal equally tenable inferences may be drawn from such inaction.'" *Ibid.* (quoting *Pension Benefit Guaranty Corporation* v. *LTV Corp.,* 496

U. S. 633, 650 (1990)).

Passing legislation is no easy task. A federal statute must withstand the "finely wrought" procedure of bicameralism and presentment. *INS* v. *Chadha,* 462 U. S. 919, 951 (1983)*; Clinton* v. *City of New York,* 524 U. S. 417, 440 (1998); see U. S. Const., Art. I, §7. Within that onerous process, there are additional practical hurdles. A law must be taken up for discussion and not passed over in favor of more pressing matters, and Senate rules require 60 votes to end debate on most legislation. And even if the House and Senate agree on a general policy, the details of the measure usually must be hammered out in a conference committee and repassed by both Houses.

\*    \*    \*

A proper understanding of our doctrine of *stare decisis* does not prevent us from reexamining *Brulotte.* Even the Court does not defend the decision on the merits. I would reconsider and overrule our obvious mistake. For these reasons, I respectfully dissent.